THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT, v. WILLIAM C. MOORE, APPELLANT.

*Larceny — procuring goods by false representations — Penal Code, sec. 528 — evidence as to the intent with which the act was committed — when the schedules of an assignee are inadmissible as against the assignor.*

The defendant was tried and convicted upon an indictment charging him with larceny in feloniously stealing a draft. The defendant was engaged in carrying on business as a banker in the village of Victor under an agreement with his brother in-law, one Upton, the president of the City Bank of Rochester, by which the latter was to furnish him with such currency as he might need and to discount the notes taken by him. Prior to December 19, 1882, Loomis & Woodworth had opened an account with the defendant and were accustomed to discount with him drafts drawn against produce shipped by that firm. On that day the defendant met one of the firm in the morning and asked him if he had anything for him that day, stating that he was short in New York. On the afternoon of that day the firm sent him the draft described in the indictment, and the same was discounted by him and the avails placed to their

credit, at the same time he paid a check drawn by them, the amount of which exceeded the amount of their deposit prior to the discount of the draft. The defendant mailed the draft to the City Bank of Rochester the same afternoon and asked for $2,000 currency. That evening he learned that the bank at Rochester and Upton had failed; he was at that time liable upon his notes loaned to Upton to the extent of $50,000. The next morning the defendant made a general assignment for the benefit of his creditors.

*Held,* that there was nothing in the representations made by the defendant, nor in the fact that he was carrying on the business of a banker, which authorizes his conviction for larceny, under subdivision 2 of section 528 of the Penal Code, for obtaining possession of or converting to his own use the said draft by means of fraudulent or false representations or pretenses.

The counsel for the defendant requested the court to charge the jury that there can be no larceny without a felonious intent — an intent to steal.

*Held,* that the court erred in refusing so to charge.

Upon the trial the defendant was asked by his counsel questions as to whether or not he intended at the time of discounting the draft to make an assignment, and as to whether he expected to pay the proceeds of the draft to Loomis & Woodworth, and as to whether at the time he expected to continue in business and be able to pay his debts as they matured. The court, upon the objection of the counsel for the people, refused to allow him to answer these questions.

*Held,* that it erred in so doing.

After the assignment the defendant went west. During his absence his assignee made an inventory and schedules of debts and liabilities. It did not appear that the defendant had ever seen or examined them. Upon the trial they were offered and received in evidence against the defendant's objection and exception.

*Held,* that this was error.

APPEAL from a judgment of conviction of the defendant for the crime of grand larceny in the first degree, entered at the Ontario Oyer and Terminer.

*John Van Voorhis,* for the appellant.

*O. C. Armstrong,* district attorney, for the respondent.

HAIGHT, J. :

On the 23d of October, 1883, an indictment was found against the defendant, at the Ontario Oyer and Terminer, charging him with the crime of grand larceny in the first degree. The indictment contained two counts. The first count charged that on the 19th day of December, 1882, with force and arms, one instrument in writing, commonly called a draft for the payment of money (describing the draft), of the value of $983.63, of the property of

one Leslie G. Loomis and Wilbur C. Woodworth, then and there being found, feloniously did steal, take and carry away, against the peace of the people of the State of New York and their dignity. The second count is in the same language, except that it contains the words "a more particular description of which said instrument in writing is to the grand jury unknown, for the reason that the said instrument in writing is in the possession of the said William C. Moore, or those claiming under him. The defendant demurred to the indictment; the demurrer was overruled. A trial was had, resulting in the conviction of the defendant, and on such conviction he was sentenced to imprisonment for the term of five years.

Upon the trial the undisputed evidence tended to show that the defendant was a private banker in the village of Victor, in the county of Ontario, and had been for about fourteen years; that he began business in a small way, having a capital of only $6,000; that before engaging in the business he advised with Charles E. Upton, the president of the City Bank of Rochester, who was his brother-in-law, and was advised by him that he would furnish him with all the currency that he wanted to carry on the business, and that he had always done so; that it was the custom of the defendant when he discounted paper, to send it to the City Bank of Rochester, and for the City Bank to furnish him with such currency from time to time, as he wanted; that in August, 1882, Loomis & Woodworth, produce dealers at Victor, opened an account with the defendant. Their method of doing business was to ship their produce and draw drafts upon it and turn the drafts over to the defendant, who would discount them, giving them credit for the avails. Upwards of fifty of such drafts had been discounted prior to the 19th day of December, 1882; on that day the defendant met one of the members of the firm in the morning and asked him if he had anything for him that day, stating that he was short in New York. Subsequently, and in the afternoon of that day, Loomis & Woodworth sent, by Daniel J. Hoag, their bank book and the draft mentioned in the indictment to the defendant's banking office; the defendant discounted the same and gave Loomis & Woodworth credit for the avails upon their book; that they also sent by Hoag a check for $365.95, which was also presented to the defendant and paid; that the amount standing to the credit of their account

at the bank before depositing the draft was only $185.39; on that day the defendant received in his bank the sum of $5,254.88, and paid out the sum of $5,098.66; on the evening of that day he learned that the City Bank of Rochester and Mr. Upton had failed and made an assignment; he had lent Mr. Upton his notes for upwards of $50,000 for the accommodation of Mr. Upton; he had by the afternoon mail forwarded the draft in question to the City Bank and asked for $2,000 in currency to be returned to him; he was depending upon the City Bank for currency with which to carry on his business. Under these circumstances, the next morning he made a general assignment for the benefit of his creditors.

It is contended in the first place that the court erred in overruling the demurrer; that the indictment is bad because more than one crime is charged therein, and that it does not contain a plain and concise statement of the act constituting the crime without unnecessary repetition.

Section 278 of the Code of Criminal Procedure provides that "the indictment must charge but one crime and in one form, except as in the next section provided." The next section provides that "the crime may be charged in separate counts to have been committed in a different manner or by different means, and where the acts complained of may constitute different crimes, such crimes may be charged in separate counts."

The only difference, as we have seen, is that one count charges "a more particular description of the property is to the grand jury unknown," etc. We are inclined to the opinion that this is permissible under the statute, and that the indictment is not demurrable upon that ground.

Section 275 provides that "the indictment must contain a plain and concise statement of the act constituting the crime, without unnecessary repetition."

Section 528 of the Penal Code provides that "a person who, with the intent to deprive or defraud the true owner of his property, or of the use and benefit thereof, or to appropriate the same to the use of the taker, or of any other person. either:

"1. Takes from the possession of the true owner, or of any other person; or obtains from such possession by color or aid of fraudulent or false representation or pretense, or of any false token or

writing; or secretes, withholds or appropriates to his own use, or that of any person other than the true owner, any money, personal property, thing in action, evidence of debt or contract, or article of value of any kind; or,

" 2. Having in his possession, custody or control, as a bailee, servant, attorney, agent, clerk, trustee, or officer of any person, association or corporation, or as a public officer, or as a person authorized by agreement or by competent authority to hold or take such possession, custody or control, any money, property, evidence of debt or contract, article of value of any nature, or thing in action or possession, appropriates the same to his own use, or that of any other person other than the true owner or person entitled to the benefit thereof, steals such property and is guilty of larceny." .

It will be observed from the reading of this statute that larceny can be committed in four different ways: First. By a person who, with intent to deprive or defraud the true owner of his property, or of the use and benefit thereof, takes from the possession of the true owner or any other person, any money, personal property, thing in action, evidence of debt or contract, or article of value of any kind. Second. By a person who, with like intent, obtains from the true owner or any other person, possession by color or aid of fraudulent or false representations or pretense, or of any false token or writing, any money, personal property, etc. Third. Any person who, with like intent, secretes, withholds or appropriates to his own use any such property, etc.; and Fourth. Any person who, with like intent, having in his possession, custody or control the property of another as a bailee, servant, attorney, agent, clerk, etc., appropriates the same to his own use.

The indictment, as we have seen, charges the taking of the draft in question " with force and arms, then and there being found, feloniously did steal, take and carry away against the peace of the people," etc. This we regard a sufficient statement of facts to bring the case within the first clause of the section, which is the taking of property from the possession of the true owner, etc. This subdivision of the section defines the crime of larceny substantially as it was defined by the Revised Statute, and such a statement, under the Revised Statute, was sufficient. The second, third and fourth subdivisions of the section constituting larceny in sub-

stance re-enact the provisions of the Revised Statutes constituting the crimes of obtaining personal property by means of false representations or pretense, the secreting, withholding and converting of property, and embezzlement by bailees, servants, attorneys, agents and officers. If, upon the trial, it should turn out that the offense proved differed from that alleged in the indictment, the question would be one of variance and could not be taken advantage of by demurrer.

The court, in its charge to the jury, said the law requires of every banker, who holds himself out to serve the public in that capacity, to a more rigid responsibility for good faith and honest dealings than ordinary contractors merchants and traders. It requires of him that he shall only deal with those men when he is able to perform the contract which he assumed to perform by virtue of dealing with them, and the very act of entering into a contract implies on his part a representation that he is able to perform his part of the contract and pay back the money deposited with him if it shall be demanded of him during banking hours. The court then says: " That was the contract which this man made, and that was the nature of the representation which the law implies him to have made when he entered into this contract with the firm of Loomis & Woodworth, at that time, if this was a deposit there. He gave them credit; he did not ask any credit, to be sure; he was not at liberty, when he had received the deposit, to say, ' I will pay you to-morrow or the next day, or the day after,' but when he received it he was implied as saying, 'I will pay you at once,' * * * that being the obligation he assumes and the representation the law implies. The question is, was that representation true? Was he in a condition to meet that obligation? As to that I fancy you will have very little difficulty. It is a question for you upon the evidence, as to whether or not he was in a condition to meet that obligation at the time he assumed it. It appears from the evidence in this case, and it is not practically disputed, as I understand it, that at this time Mr. Moore was not a solvent man. * * * The obligation which this man assumed, by virtue of his business as a banker, was that he would pay his depositors the amount each depositor had with him whenever it was demanded. The obligation was, therefore, to pay on demand, and if he was able to

do that he was solvent; if he was not able to, he was legally insolvent."

It will thus be observed that the case was tried and submitted to the jury upon the theory that the false representations and pretense relied upon to convict, were to be determined from the implications arising from the fact of his doing business as a banker, and of his insolvency. Whilst these implications are often relied upon in civil actions, for the purpose of establishing fraud so as to disaffirm contracts and recover back property sold, we are not aware of any case in which such implication has been relied upon to establish larceny or the crime of obtaining property by false pretense.

The question thus presented is of considerable importance. It is not claimed that the evidence would justify the conviction of the defendant under the first, third or fourth subdivisions of the section. Conviction is only claimed under the second subdivision, which is that a person who, with intent to deprive or defraud the true owner of his property or of the use and benefit thereof, or to appropriate the same to the use of the taker, or of any other person, obtains from the true owner or any other person possession by color or aid of fraudulent or false representations or pretense, or of any false token or writing, any money, personal property, thing in action, evidence of debt or contract or article of value of any kind, steals such property and is guilty of larceny. The Revised Statute provided that "every person who with intent to cheat or defraud another shall designedly, by any false pretense, obtain from any person any money, personal property or valuable thing, shall, upon conviction, be punished by imprisonment," etc.

In comparing the provisions of the Penal Code and those of the Revised Statutes, it will be observed that the only substantial change is the incorporating of the word " representations " in the Penal Code, so as to read " false representations or pretense." Otherwise the provisions are substantially the same. It is not claimed in this case that there was any false token or writing by means of which the defendant obtained possession of the draft. It is not claimed that there was any oral or written representations in reference to his means or ability to pay the draft. The only oral communication that passed between them was the asking of the the question, if they had anything for him that day, and the state-

ment that he was short in New York. This was not a representa-
tion as to his ability to pay; if it proved anything, it would rather
. tend to prove that he was in financial trouble, and thus serve as a
warning rather than an inducement to deposit with him. The
people's case in reference to false representations and pretense rests
solely upon legal presumptions.

In order to constitute the crime of larceny the draft must be
obtained by means of false representations or pretense. We do not
understand that the failure to disclose the fact of insolvency, when
purchasing property upon credit, would amount to a false represent-
ation or pretense within the meaning of the Code. To so construe
the statute would practically close every avenue to business to the
entire insolvent population of the country. If the individual doing
business publishes beforehand his insolvency, he thereby closes the
door so that he is unable to procure credit and carry on his busi-
ness. Being insolvent, he has no capital of his own with which to
maintain his business. If, by purchasing upon credit without dis-
closing his insolvency, the law will imply a false representation or
pretense that he is able to pay, and if such false representation or
pretense exists, the law will further assume an intent to cheat and
defraud, it would follow that the entire insolvent community by
continuing in business would become liable to an indictment and
conviction for larceny.

By reference to Cowen's Criminal Digest (at p. 320), we find
it stated that "a false pretense must relate to an existing fact,
any representation as to what will or will not happen cannot be
considered as a false pretense. So that if a man obtain goods
by promising to pay cash for them, or to pay for them at a
future time, or gives his note for them with assurances that it
will be paid at its maturity, when at the same time he does not
intend to pay, these are false promises because there is no pretense
that any fact exists; there is no representation as to what is then
untrue." And again he says: "As a general rule, there must be a
false representation by words, written or spoken by the accused, or
by some one for him, to which he gives his assent. A mere
false show or appearance, however specious or successful it may be,
will not support a prosecution under the statute. The false pre-
tense must not only be a misrepresentation as to an existing fact,

but it must be a willful misrepresentation ; or, in other words, the party must know that he is making a false representation, and it must be so alleged in the indictment. * * * The false pretense must be one, to which the jury may believe the person defrauded might and actually did give credit." And again he says, at page 326 : " An allegation by speech is necessary to constitute false pretense." And again : " No false pretense made after the delivery of goods, can support an indictment for obtaining such goods by false pretenses. The false pretenses must be predicated on some matter or thing pretended then to be in existence, but which in truth was not." (*People* v. *Conger*, 1 Wheeler's Cases, 448 ; *Daniel K. Allen's Case*, 3 City Hall Recorder, 118 ; *Ranney* v. *The People*, 22 N. Y., 413 ; *James Conger's Case*, 4 City Hall Recorder, 65 ; 1 Colby's Criminal Law, 561, 562, 563.)

Russell on Crimes (at page 288, volume 2) says : " Barely asking another for a sum of money is not sufficient, but some pretense must be used and that pretense false, and the intent is necessary to constitute the crime.

Wharton in his work on Criminal Law (7th ed.), says : " There must be always something to show adequately that the party defrauded was induced to part with his property by relying upon the truth of the alleged false statements." (Sec. 2162.)

And again, at section 2113, he says : In certain cases " the conduct and acts of the party will be sufficient, without any verbal assertion. Where a man assumed the name of another to whom money was due, required to be paid by a genuine instrument, it was held indictable. And where a person at Oxford, who was not a member of the university, went for the purpose of fraud, wearing a commoner's cap and gown and obtained goods, it was held within the act though not a word passed. And so where the defendant, an employee in a hospital, wrote to a manager for linen, not saying in words that it was for the hospital, but knowingly making that impression on the manager's mind." But in all of these cases it was by means of false token or writing.

Bishop, in his work upon Criminal Procedure (vol. 2, at § 165), says that the allegation in the indictment that the money or other thing was obtained by means of false pretense, which are the

statutory words, is not sufficient. The allegation must state what the pretenses were.

We have thus seen that under the Revised Statute there must be some false representation or pretense, or else some false token or writing by which the party was deceived and induced to part with the possession of his money or property, in order to constitute the crime.

Section 544 of the Penal Code provides that "a purchase of property by means of a false pretense, is not criminal, where the false pretense relates to the purchaser's means or ability to pay, unless the pretense is made in writing and signed by the party to be charged."

Here we have express statutory enactment providing that on the purchase of property it shall not be criminal, unless the false pretense is made and put in writing, and signed by the party to be charged, where it relates to his means or ability to pay.

Inasmuch as there may be some question about the deposit of the draft being "a purchase of property," within the meaning of the Code, we prefer not to rest our decision upon its provisions.

In the case under consideration the only representation claimed was the ability of the defendant to pay the draft when called upon by Loomis & Woodworth, and such representations were to be inferred from the fact that he was doing business as a banker and at the time was insolvent. It appears to us that the conviction under such circumstances is in direct conflict with the authorities to which we have referred.

The counsel for the defendant asked the court to charge the jury that there can be no larceny without a felonious intent — an intent to steal. The court refused to so charge and the defendant excepted.

The district attorney argues that under the provisions of the Penal Code the felonious intent to steal is not necessary. It appears to us, however, that this question is settled by the express provisions of the section. "A person who, *with intent* to deprive or defraud the true owner of his property, or of the use and benefit thereof," etc. This clause refers to and qualifies the four subdivisions of the section defining larceny. "Felonious" is defined by Webster to be "malignant, malicious, villainous, traitorous, perfidious." Felonious intent, where used in penal statutes, means

criminal intent, and criminal intent is an intent to deprive or defraud the true owner of his property.

The felonious intent must exist at the time of taking or obtaining possession of the property, where the possession is obtained by means of false representation or pretense. Where, however, the offense consists in the secreting, withholding or appropriating, or where it consists in the appropriating of property by bailee, servant, attorney, agent, clerk, etc., it is only necessary that the felonious intent exists at the time of such secreting, withholding or appropriating of the property, for in such cases the property stolen would be properly in the possession of the party secreting, withholding or appropriating it.

Upon the trial the defendant was sworn as a witness in his own behalf and was asked the following questions: "At the time you received the draft, on the nineteenth of December, did you have any intimation, knowledge or intention of making an assignment?" Again: "At the time you received the draft and gave Loomis & Woodworth credit for it, did you intend and expect to pay the proceeds to them when called for?" Again: "Up to the time when your son arrived from Rochester that evening, had you any intention of making an assignment?" Again: "At the time you took this draft, on the 19th of December, 1882, did you believe, relying upon your skill and experience as a banker, your credit, and the means you had at your command, that you could continue in business and pay your creditors as their claims matured?" And again: "At the time you received this draft did you intend and expect to go on with your banking business and pay your debts as they matured?

Each of these questions was objected to by the people. The objection sustained and the defendant excepted. It appears to us that the questions were proper and that the defendant should have been permitted to answer them. The question of his intent was at issue and was one of the elements constituting the alleged crime. It appears to us that he had the right to show that he believed Mr. Upton to be a man of large means, possessing sufficient ability to take up the notes amounting to $50,000 and upwards that the defendant had loaned to him for Upton's accommodation, and that consequently he did not believe himself insolv-

ent at that time ; that he supposed and believed that the City Bank would continue to rediscount his paper and furnish him with necessary currency to continue his business ; that he had no intention of making an assignment, but, on the contrary, he expected and intended to continue his business, and pay the proceeds of this draft over when called for, as well as his other depositors. (*Kerrains* v. *The People*, 60 N. Y., 221.)

After the defendant had made his assignment for the benefit of creditors, he went west. During his absence the assignee made an inventory and schedules of his assets and liabilities. It did not appear that the defendant had ever seen or approved of them. Upon the trial they were offered in evidence by the people, and received under the objection and exception of the defendant. The object of this evidence was to show insolvency. We do not understand that they were competent.

In the case of *Tyler* v. *Brock et al.* (68 N. Y., 418), the action was brought by the plaintiff as assignee in bankruptcy of Edmund S. and George D. King, to recover of the defendants Brock et al., the value of certain goods alleged to have been transferred by the bankrupts to the defendants in violation of the bankrupt act. Schedules of indebtedness made and verified by the bankrupts were admitted in evidence. It was held that they were improperly admitted ; that they were immaterial unless offered for the purpose of showing the insolvency of the Kings, and if offered for that purpose they were not competent evidence as against the defendants. (See, also, *Turner* v. *See*, 57 N. Y., 667.)

The case of *Abbott* v. *The People* (15 Hun, 437), is distinguishable. In that case the schedules were made and sworn to by the prisoner, and were consequently evidence against him.

Numerous other exceptions were taken upon the trial, but under the view which we have taken of the case we do not regard it as necessary to consider them at this time.

The judgment and conviction should be reversed, and the proceedings remitted to the Court of Oyer and Terminer of Ontario county.

SMITH, P. J., BARKER and BRADLEY, JJ., concurred.

So ordered.